Nat M. Kahn, Appellee, v. Continental Casualty Company, Appellant.

Gen. No. 42,799.

2

Heard in the third division of this court for the first district at the October term, 1943. Opinion filed October 11, 1944. Rehearing opinion filed February 14, 1945. Released for publication March 5, 1945.

TAYLOR, MILLER, BUSCH & BOYDEN, of Chicago, for appellant; JAMES J. MAGNER, of Chicago, and DALLAS I. KEPHART, of Winnetka, of counsel.

NAT M. KAHN, *pro se.*

ON REHEARING.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

The Continental Casualty Company, a corporation defendant, appeals from a decree of the superior court of Cook county in favor of Nat M. Kahn, plaintiff, which held that on payment of all accrued premiums, defendant should reinstate plaintiff's lapsed noncancellable health and accident insurance policy. The case was heard by the chancellor.

Plaintiff is an attorney and has practiced his profession in Chicago continuously since 1916. He has a good practice and bears a good reputation. He believed in providing for himself and his family by building up an adequate insurance program and this included the protection he would have in the event he should become completely disabled before he reached the age of 61 years. On May 15, 1923, following the submission and consideration of the conventional written application and a medical examination, defendant issued to plaintiff its noncancellable accident and health income policy No. C–100697. This policy was good for a term of one year from its date. The in-

sured had the right to renew the policy from year to year by the payment of an annual premium of $172 on or before May 15 or within a 31-days grace period thereafter. Unless so renewed each year, the policy would automatically come to an end, subject to the operation of the "Reinstatement Clause." This was a noncancellable health and accident policy and derives its name from the fact that it reserves no right to the Company to cancel the policy for reasons deemed sufficient by the Company. Contrariwise, it was the insured's right, by the payment of the annual premium, to keep the policy in force from year to year until he should reach the age of 60 years. Indemnities under the policy were as follows: For permanent disability from accidental injuries or sickness $400 a month for life; for accidental death $10,000. For 18 consecutive years prior to June 15, 1941, plaintiff paid premiums under the policy aggregating $3,096. At no time during this period did plaintiff make a claim of any nature for disability payments under the policy. Certain clauses of the policy are pertinent to this review. On the face of the policy, it is said: "The date of this policy is May 15th, 1923, and its annual premium is $172, to be paid in advance." Clause 21 provides:

"This policy becomes effective upon its issue and delivery, if said annual premium has then been paid in full, but otherwise it does not become effective until said premium has been paid. It expires at 12 o'clock noon (Standard Time at residence of Insured) one year from date except as it may be continued by renewal for terms of one year each or by the period of grace hereinafter given."

Clause 22 reads:

"Until the Insured becomes sixty years of age, he shall have the right to renew this policy from year to year by the payment of premium as herein provided. All premiums are due and payable on or before the anniversary date of this policy either at the General Of-

fice of the Company in the City of Chicago or to any authorized agent of the Company, but a grace period of thirty-one days shall be granted for the payment of every premium after the first, during which time the insurance hereunder shall continue in force. No premium receipt is valid unless signed by the President or a Vice-President or the Secretary or an Assistant Secretary of the Company. After any default in payment of premium, this policy may be reinstated as provided in standard provision number three at any time within six months from the date of such default on written application by the Insured to the General Office of the Company and the payment of the defaulted premium, provided the Insured shall submit with such application evidence of insurability satisfactory to the Company.''

Standard provision 3, mentioned in Clause 22, reads:
''3. If default be made in the payment of the agreed premium for this policy, the subsequent acceptance of a premium by the Company or by any of its duly authorized agents shall reinstate the policy but only to cover accidental injury thereafter sustained and such sickness as may begin more than ten days after the date of such acceptance.''

Clause 24 reads, in part:
''24. Indemnity for disability will not be paid under this policy at a rate in excess of the average earnings of the Insured for the period of time that he has been actually employed during the two years immediately preceding the commencement of disability for which the Company is liable. All premium paid during said two years for that portion of the disability indemnity in excess of the amount thus determined will be returned upon request of the Insured. The Insured shall have the right to reduce all or any of the indemnities of this policy on any anniversary of the date hereof and upon his request and the temporary surrender of the policy for endorsement, the Company will

endorse it making such reduction of indemnity and a proportionate reduction in premium."

Clause 23 states, *inter alia,* that "this insurance does not cover suicide or self-destruction while either sane or insane." Clause 27 provides for the surrender of the policy and the issuance of a new policy, should the insured change his occupation.

Plaintiff's premium in the amount of $172 became due on May 15, 1941, and he received a notice thereof. About May 24, 1941, after the due day of the premium on the policy in suit, he took delivery of an accident policy issued by the Fidelity and Casualty Company of New York, providing indemnity in the amount of $233.33 per month. Plaintiff did not pay the Continental premium on May 15, 1941. The 31st day after May 15, 1941 was June 15, 1941. That day fell on a Sunday. On Monday, June 16, 1941, plaintiff prepared a check in the amount of $172, payable to the defendant, but did not mail it. On Tuesday, June 17, 1941, plaintiff caused the check to be certified and sent the check by messenger to a branch office of the company, where it was declined. He then sent it by messenger to the main office of the company, where it was also declined as "late." The messenger was given an application form for reinstatement. Later that day defendant wrote a letter to plaintiff, explaining that the policy had expired; that it regretted that no exceptions to their rules could be made in the plaintiff's case and suggested that he fill out the "enclosed" application for reinstatement. Between the dates of June 18, 1941 and June 26, 1941 there were conferences between plaintiff and the officers of the defendant, and numerous letters were exchanged. In this correspondence they argued their respective positions. Plaintiff insisted that his payment was not late, and if late, not very late, and that he was not required to apply for reinstatement. The defendant explained that the policy had lapsed and expired with the grace period; that no

exception could be made in his case, and suggested that he fill out the application for reinstatement, which would be given prompt and careful attention. On June 25, 1941 plaintiff interlined and amended the reinstatement form, striking out the words "Application for reinstatement" and calling it simply a "Statement." He answered all the questions in the form, altering the text of some of them, and then mailed the form to the company. The questions and answers pertinent to the issues were as follows:

"4. Were your earnings from your daily occupations excluding interest, rentals, royalties, dividends, etc., in the last twelve months, at least double all the indemnities in this policy? Yes.

"13. What is the maximum indemnity payable to you from all policies, in all companies, life, accident, and accident and health, at present owned or now being applied for? (A. Life insurance. B. Accident and Health insurance.)

| a—Name of Company | Amount of policy | Amt. payable for Accidental Death | Amt. payable monthly in case of Disability |
|---|---|---|---|
| Equitable of N. Y. | 15,000.00 | 15,000.00 | |
| Metropolitan Life Ins. | 25,000.00 | 25,000.00 | 250.00 |
| Northwestern Mut. Life | 5,000.00 | | |
| Prudential Life Ins. | 5,000.00 | 5,000.00 | |
| | $50,000.00 | $45,000.00 | $250.00 |
| b— | | | |
| Continental Casualty | | 10,000.00 | 400.00 |
| Fidelity & Cas. of N. Y. | | | 233.33 |
| | $50,000.00 | $55,000.00 | $883.33 |

"15. How much was your earned income in the previous calendar year? $7,958.86."

On June 28, 1941 the defendant's chief underwriter replied to the plaintiff that it would accept and consider his statement as an application for reinstatement, without prejudice either to his rights or to the rights of the defendant. The letter went on to say:

"Your application lists approximately $883 of monthly disability indemnities, including our policy. Our Company is willing to participate in up to $500 of monthly indemnity, or 50% of an applicant's net earned income, either or both. The $500 maximum limit must include our policy and all other policies carried, therefore, before going into the question of medical insurability, it will be necessary that this difference between earnings and indemnities be adjusted. You can handle it in one of two ways, either by reducing or canceling other insurance policies, possibly those having temporary or limited benefits, or reducing our policy. When the question of indemnities is cleared up, we can then go into the physical insurability which, if satisfactory, will permit approving your policy for reinstatement. Since you are located in the city, may we suggest that if you have the time to visit us, we can then go into this matter more thoroughly and in greater detail, or if that would not be convenient for you, please feel free to telephone us. Our phone number is Wabash 7272."

As the parties persisted in their views, the complaint was filed.

Noncancellable health and accident policies of the type issued to plaintiff have not been sold for at least the past 12 years. The companies which formerly sold this type of policy, including defendant, lost money on such policies. About 1932 defendant ceased issuing noncancellable life and accident insurance of this type. At the time of the hearing it was established that it is

impossible to purchase in the United States a comparable policy, that is to say, a noncancellable health and accident policy which did not have a limitation of the total amount, or a limitation as to the period of time that a stipulated amount should be paid. It is common knowledge that ordinary straight accident policies can be purchased from practically any of the numerous companies doing business in the United States, and that the type of protection under such policies is entirely different from that afforded by the noncancellable health and accident insurance policy in suit. The latter policy did not have what is commonly known as a "pro rata" clause (which the defendant prefers to call an "indemnity apportionment" clause). Nor does the policy contain a clause prohibiting plaintiff from obtaining additional insurance without the consent of the defendant. The direct function of a pro rata or indemnity apportionment clause is to apportion the insured's indemnity among several insurers on the theory that under such insurance all the insured is entitled to recover is an amount which will make him whole. Such clauses usually provide that if the insured takes out additional insurance policies covering the same loss, without notifying the insurance company, and then becomes disabled through sickness or accident, the first insurance company, in such event, will merely pay out that percentage of its promised indemnity that its promised indemnity bears to the total amount of all indemnities promised to the insured under all his policies. The policy has an indemnity limitation in Clause 24. Plaintiff insists that this clause is not applicable to him because he is not "employed." He established that at the time he filed his application for reinstatement of the policy in suit he was married, had a family, was a lawyer of experience and standing and that he was in excellent health. At the trial he proved, without dispute, that as recent as July 1942 he underwent

a complete physical examination, including an electrocardiac test, and was found to be in excellent health; and that for a period commencing March 26, 1941 to October 28, 1942, every few months he had a chemical and microscopic urinalysis made, all of which were negative.

▮ We turn to a consideration of plaintiff's argument that the premium payment tendered was not late. The anniversary day of the policy was May 15 of each year. The period denominated as the 31-days grace period is an essential part of the contract. It amounts to an agreement to carry the risk during the extended time in consideration of the premiums theretofore paid and with the hope and with the incentive that, if the policy does not mature in the meantime, the premiums will be kept up. *Penn Mut. Life Ins. Co. of Philadelphia v. Miller,* 16 F. (2d) 13, 15. Nevertheless, the premium became due and payable on May 15. Plaintiff received a premium notice before May 15, 1941. The 31st day of grace was June 15, a Sunday. There was testimony that in the Chicago area insurance companies will accept checks for premiums mailed, if the envelope is postmarked before midnight of the last day, even though the checks do not reach the office of the insurance company until the day following the last day of grace. Plaintiff urges that he had the right to consider Monday, June 16, as the last day of grace under his contract, and that inadvertently he did not mail his check on that date, but that he tendered it on Tuesday, June 17. He states that at most the check was tendered 10 hours late, and that no notice of any lapse or forfeiture was served on him by defendant before the tender was made. The check was not mailed on Sunday, June 15, nor on Monday, June 16. It was delivered on Tuesday, June 17. Clearly the period of grace of 31 days had expired at the time he tendered his check for the premium. His rights in the premises are not affected by the circumstance that he was "only

10 hours late." Under the policy there was a six months period in which to apply for reinstatement. The man who comes in during the sixth month is entitled to the same consideration as the man who came in during the first month. The rule operates on all alike. There is no provision in the policy making lapse or expiration of the policy contingent on notice to him. In fact, the policy provides that it expires unless the premium is paid when due or within the grace period. We hold that under the policy there was no duty on the defendant to give notice that the policy had lapsed. There is no merit to plaintiff's contention that the policy was in full force and effect at the time the tender was made.

■■ Plaintiff asserts that forfeitures are not favored and that a court of equity will relieve against a forfeiture when full compensation can be made to avoid the forfeiture. Coupled with this point, plaintiff states that on two previous occasions defendant accepted premiums after the expiration of the grace period, which established a course of conduct warranting him to believe that defendant would waive any right it had to forfeit the policy, if the premium was paid or tendered a reasonable time after the expiration of the period of grace. On at least two occasions, in 1925 and 1930, defendant accepted premiums after the expiration of the grace period. Forfeitures of life insurance policies are not favored. Plaintiff received notice in apt time that his premium became due on May 15, 1941. The policy does not require a further notice that it would lapse on failure to pay within the grace period. We agree with defendant that it takes a settled course of conduct to erect a waiver of the forfeiture. In two out of 18 years defendant accepted a premium a day or two late. The acceptance of a single overdue premium establishes no custom, although it constitutes a waiver of failure to pay that particular premium on time, and that is true of the acceptance of a comparatively few

of a large number of premiums after they are only a few days overdue. 29 Am. Jur. § 860, p. 658. We are satisfied that the record in this case does not show a settled course of conduct to establish a waiver by defendant of the provision lapsing the policy for non-payment of premium.

■ Defendant maintains that its refusal to reinstate was not arbitrary, unreasonable or capricious, and that the decree is contrary to the evidence. It urges that the phrase "evidence of insurability satisfactory to the Company" does not limit the company to an inquiry into matters of health alone. Plaintiff insists that this phrase is to be taken in its ordinary and plain meaning and the popular sense in which it is understood, and that the word "insurability" is no more comprehensive than the words "good health" and an "insurable interest." Plaintiff cites *Missouri State Life Ins. Co. v. Hearne* (Tex. Civ. App.), 226 S. W. 789, where the court said (795):

"It may be that the word 'insurability,' as applied to life insurance as understood by insurance companies, has a meaning more comprehensive than that of good health and an insurable interest; but such is not its ordinary and plain meaning. . . . The word 'insurability' does not include in its meaning 'desirability,' and when the applicant for reinstatement complies with the other requirements of his policy, and shows himself to be in perfect health, the company, under a contract like the one in this case, is bound to reinstate the policy, and any additional promise or warranty required of the applicant to obtain his reinstatement is void for want of consideration."

In the *Hearne* case the question presented was whether the insurance company was liable for the full amount of the policy or for the amount of the reserve against the policy. The insured had died by suicide after the policy had been reinstated, pursuant to an application.

In his application for reinstatement the insured had agreed that if he should die by suicide within one year from the date of reinstatement, liability should then be only for the amount of the policy reserve. The court held that all premiums having been paid by the applicant in accordance with the terms of the policy, the policy had been restored to its full force, and that the additional agreement required by and stated in the later written application for reinstatement (to the effect that if the insured died within one year from the date of reinstatement the amount of liability should be only the amount of reserve against the policy) was void for want of consideration. Defendant calls attention to the case of *Kallman v. Equitable Life Assur. Society of United States,* 248 App. Div. 146, 288 N. Y. S. 1032, affirmed without written opinion by the New York court of appeals, in 272 N. Y. 242. In the *Kallman* case the appellate division pointed out that although conceding that at the time of application for reinstatement the insured was a satisfactory risk from the ordinary standpoint, the defendant declined to reinstate the policy. This refusal was the result of an investigation which disclosed that he was not engaged in business as represented by him and had not been so engaged for more than three years; that he was carrying additional life insurance in excess of $159,000, a sum entirely out of proportion to his income and financial standing; that he admitted his income did not warrant his continuing so much insurance; that he had borrowed practically to the limit of the loan value of his insurance; and that a remark made by him during an interview with him in connection with his application for reinstatement warranted the inference that the idea of suicide was not absent from his mind. He did commit suicide on January 8, 1935. Action on the policy was commenced by the beneficiaries on July 22, 1935. On a motion for summary judgment the plaintiffs were awarded the face

amount of the policy and defendant appealed. The question presented was "does the language of the statute and of the policy 'evidence of insurability satisfactory to the company' limit the inquiry on an application for reinstatement to the good health or good physical condition of the insured?" The appellate division said (1034):

"Prior to 1906 in policy provisions covering reinstatement the expression commonly used was 'good health.' Following the so-called Armstrong investigation, the Legislature endeavored to improve and standardize insurance practice. In the provision covering reinstatement of policies the Legislature made use of the words 'evidence of insurability satisfactory to the company.' It may not be said that this change was without significance. Had the Legislature intended that the company should be satisfied with evidence of good health, it would have authorized continuance of the theretofore common expression 'good health.' . . . We are of the opinion that the language of the statute and of the policy 'evidence of insurability satisfactory to the company' does not limit the inquiry upon an application for reinstatement to the good health or physical condition of the insured. Under the provisions of the Insurance Law, the Legislature has delegated to the company the right to say whether or not the evidence of insurability is satisfactory. This does not mean, however, that the company may arbitrarily determine that such evidence is not satisfactory. 'The agreement did not contemplate the exercise of the insurer's taste or fancy or caprice.' *Thompson v. Postal Life Insurance Co.,* 226 N. Y. 363, 367, 123 N. E. 750, 751. There must be some sound and valid reason for finding the applicant no longer insurable. Here, the insured's pecuniary circumstances coupled with his heavy insurance, entirely out of line with his income and financial condition, had a definite bearing upon his longevity and created a moral hazard which directly affected his insurability."

The case of *Greenberg v. Continental Casualty Co.,* 24 Cal. App. (2d) 506, 75 P. (2d) 644, decided by the district court of appeals, 2nd dist., div. 1, Cal., also supports the defendant's contention. We have read all of the cases cited by the parties and agree with defendant that the phrase "evidence of insurability satisfactory to the Company" does not limit the company to an inquiry into matters of health alone.

Plaintiff maintains that the words "satisfactory to the Company" in a reinstatement clause do not give the insurance company any discretion in accepting applications for reinstatement, wherein the insured evidences his insurability, *i.e.,* his good health. *Thompson v. Postal Life Ins. Co.,* 226 N. Y. 363, 123 N. E. 750 (an opinion by Mr. Justice CARDOZO) is a leading case on this point. The insurance company contended that the application for reinstatement was not "satisfactory" evidence of his insurability. The court said (page 751):

"It is no answer to say that the evidence of his condition was not satisfactory to the insurer. The agreement did not contemplate the exercise of the insurer's taste or fancy or caprice. *Crawford v. Mail & Ex. Pub. Co.,* 163 N. Y. 404, 57 N. E. 616. 'It could not be unsatisfied with the certificate, capriciously. That which the law will say a contracting party ought in reason to be satisfied with that the law will say he is satisfied with.' *Miesell v. Globe Mut. Life Ins. Co.,* 76 N. Y. 115, 119. In the case cited we applied that principle to a very similar situation. There are other cases to the same effect. *Dennis v. Mass. Benefit Ass'n.,* 120 N. Y. 496, 505, 24 N. E. 843, 9 L. R. A. 189, 17 Am. St. Rep. 660; *Knights Templars' Life Indemnity Co. v. Jacobus,* 80 Fed. 205, 25 C. C. A. 378; *Leonard v. Prudential Ins. Co.,* 128 Wis. 348, 107 N. W. 646, 116 Am. St. Rep. 50. This insurer had agreed to reinstate and waive if satisfactory evidence of insurability was supplied. Evidence that ought to have satisfied was supplied, and thereupon, without further act of

the insured or the insurer, the policy was revived. *Miesell v. Globe Mut. Life Ins. Co., supra; Dennis v. Mass. Ben. Ass'n., supra; Reed v. Provident Savings Life Assur. Soc.,* 190 N. Y. 111, 120, 82 N. E. 734; *Knights Templars' Life Ins. Co. v. Jacobus,* 80 Fed. 202, 205, 25 C. C. A. 378.''

Adopting the language of Mr. Justice CARDOZO, the chancellor in the case at bar was called upon to decide whether evidence that ought to have satisfied, was supplied. If such evidence was supplied, the decree should be sustained. We accept the statement of plaintiff that the right to revive the policy by reinstatement is a valuable contractual right, the consideration for which is found in the premiums paid and to be paid under the original policy and that the insurer has no arbitrary or discretionary right to refuse reinstatement if all the conditions thereof have been complied with. *Kennedy v. Occidental Life Ins. Co.,* 18 Cal. (2d) 627, 117 P. (2d) 3, 6; *People v. Illinois Bankers Life Assur. Co. of Monmouth,* 283 Ill. App. 6, 9. We are mindful of the statement of our Supreme Court in *Froehler v. North American Life Ins. Co.,* 374 Ill. 17, 23:

''In the case which we are now considering the insured had a contractual right to be reinstated and this provision of his policy was as valid and binding as any other provision therein. Under such a policy as this one the lapse for nonpayment of premiums does not make necessary the formation of a new contract, but the reinstatement, when effected, merely cancels the forfeiture, leaving the original contract in full force. (*Monahan v. Fidelity Mutual Life Ins. Co.,* 242 Ill. 488; 4 Cooley on Insurance, (2d ed.) p. 3800.) The truth or falsity of the statements as to health are to be determined as of the date the certificate is made. . . . In his original policy of insurance the deceased bought and paid for a right to be reinstated

after default in payment of premium upon furnishing evidence of insurability satisfactory to the company, and the payment of all past-due premiums with interest.''

Defendant argues that a court of equity will not substitute its judgment for the judgment of an insurance company on a purely underwriting question. This argument was rejected by the Supreme Court of California in *Kennedy v. Occidental Life Ins. Co.,* 18 Cal. (2d) 627, 117 P. (2d) 3, where that court said (page 7):

''However, the statement of the court, in the *Greenberg* case, that what shall constitute 'satisfactory evidence' of insurability 'is purely a private matter addressed to the discretion of those officers of the company charged with the responsibility of determining such question, and is in no sense that judicial discretion which appellate courts have the authority to review,' must be disapproved. The overwhelming weight of authority is to the effect that an agreement to reinstate an insurance policy upon 'satisfactory evidence' of insurability does not give the insurer the power to act arbitrarily or capriciously, but that evidence which would be satisfactory to a reasonable insurer is all that is required.''

At the time of the application for reinstatement and at the time of the trial, plaintiff enjoyed good health. We have examined the record to determine whether defendant, in refusing to reinstate the policy, acted unreasonably, capriciously or unfairly. The undisputed testimony of Clarence O. Pauley of the Great Northern Life Insurance Company, a concern engaged in the writing of life, health and accident insurance and not connected with defendant, and A. B. Hvale, assistant secretary of defendant, was that in considering and acting upon applications for reinstatement of health and accident policies, the same factors were to

be considered as when the companies acted upon original applications for such insurance; that the factors involved (1) an inquiry into the health, (2) the occupation of the applicant, and (3) the "moral hazard" present in the facts of the risk. Both witnesses testified that in the case of noncancellable health and accident policies, it was the custom and practice of insurance companies not to insure or to participate in health and accident insurance providing indemnities for the full amount of the demonstrated earning capacity; that in the case of noncancellable policies, the prevailing maximum limit of insurance for the total indemnities was from 50 to 60 per cent of the insured's demonstrated earned income, exclusive of dividends, rents and royalties; and that the reason the insurance companies follow the practice of requiring the insured to be a co-insurer of his earning power, to some extent, is in order to protect against malingering, carelessness, self-imposed accidents and the like. On the basis of plaintiff's application for reinstatement, his average monthly earnings in the year preceding 1941 were $663 per month, and if a two-year average were taken the earnings were $761 per month. According to the evidence of Pauley and Hvale, sound underwriting judgment would indicate that plaintiff was insurable for total indemnities of approximately $400 per month. In its letter of June 28, 1941 defendant informed the plaintiff that in view of the fact that he had been a policyholder for a number of years, with a good claim record, it was willing to participate in accident and health insurance indemnities totaling $500 a month; that he could either reduce the amount of indemnities in the other policies, or reduce the Continental policy. This amounted to a rejection of the application for reinstatement and a counter-proposal. Defendant in its brief inquires that having in mind that plaintiff had only a month previously taken delivery of an accident policy from the Fidelity & Casualty Com-

pany of New York, providing accident indemnities in the amount of $233.33 per month, why he could not have cancelled this short-lived policy in order to help make the revision correcting his over-insured condition. Plaintiff obtained the policy in suit in 1923 on the statement that his average monthly earnings from his occupation exceeded all disability indemnities he then had under policies then existing, together with the policy he applied for. He was also asked about his occupation, policies in other companies, habits, of the countries he lived in, and whether he contemplated a change in occupation. All of these questions related to factors other than good health, and all directly bore upon his insurability. We agree with defendant that it would be inconsistent that "insurability" meant one thing when a policy was written and another when it is asked to be reinstated after lapse.

An accident or health policy is primarily a contract of indemnity, while a life insurance policy is a contract to pay a fixed sum at death. Plaintiff suggests that it was improper for defendant to count all disability benefits from all of his policies. All disability benefits were inquired about and considered in 1923, when plaintiff's policy was issued. There can be no inconsistency in applying the same test in 1941. Defendant's policy provided indemnity for accident and sickness and covered the same hazards as the other policies. We are of the opinion that it was proper to count all other indemnities from similar hazards. Both in the application of 1923 and in its policy provisions defendant evidenced a clear intent not to insure or to participate in insurance for an amount greater than plaintiff's demonstrated earning power. Plaintiff had complete control of his own status so far as the amount of insurance indemnities was concerned. All of his policies were taken out after 1923. Plaintiff's application for reinstatement asked defendant to reinstate him for $400 a month of disability coverage,

which, with the disability coverage of his other policies, was $220 a month more than he had an insurable basis for, assuming a 100 per cent coverage to be a proper coverage and assuming a monthly earning capacity of $663 based on the preceding calendar year, or $120 a month based on a two year average. In our opinion, defendant adhered to sound underwriting practice in declining to reinstate plaintiff's policy and did not act arbitrarily or from whim or caprice.

Plaintiff points out that the *Kallman* case was an. opinion by the appellate division. The judgment of the appellate division was affirmed by the court of appeals without opinion in 272 N. Y. 42. Thereby, the court of appeals, in effect, approved the opinion. We are satisfied that the *Kallman* opinion announces the correct rule to be followed. The *Kallman* case decided that factors other than good health are proper to be considered on an application for reinstatement. In 1907, as an outgrowth of the Armstrong committee investigation, of which Mr. Justice CHARLES EVANS HUGHES was counsel, the New York State legislature initiated a number of legislative reforms, including prescribing a standard life insurance policy. form. The legislative progenitor of the present commonly used "Reinstatement Clause" seems first to have made its appearance in 1907 in the New York standard life insurance policy form and in the following text: " . . . In the case of continued temporary insurance under any of the above provisions, this policy, upon satisfactory evidence of insurability, may be reinstated during the term for which the insurance is continued." Insurance Laws of 1907, page 877. The clause has been modified from time to time until it is now in common use in substantially the same text as that of Clause 22 of the policy in suit. By reference to par. (i) of sec. 224 of the Insurance Code (subpar. (1), par. 836, ch. 73, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 66.899, subpar. (1)]) it will be

found that life insurance policies issued or delivered in Illinois, other than industrial, group or annuities and pure endowments, with or without return of premiums, or of premiums and interest, are required to contain a clause that the policy may be reinstated ''upon evidence of insurability satisfactory to the Company.'' No such clause is required (in Illinois) to be inserted in an accident or health policy. It is a well-established principle of statutory construction that if the legislature of one State adopts a statute having its origin in another State, the adoption of the statute brings to the second State the same statutory construction placed upon the statute by the courts of the first State. The foregoing discussion indicates that the legislative intent was to shift away from a narrow and limited meaning, such as ''good health.'' While the statute required the clause under discussion to be inserted in a life insurance policy, the construction of the language as given in the New York case and approved by the highest appellate tribunal of that State, is applicable to an accident and health policy such as we have in the instant case.

■ The reinstatement clause operates in the event of a lapse. This clause specified in what way and what conditions must be complied with before the expired policy could be restored to life. The reinstatement clause alone survived the lapse. It was for the company's officials in the first instance to determine the plaintiff's insurability. That presented a question of fact calling for the exercise of an insurance judgment. We agree with defendant that there is no force to plaintiff's argument that in the determination of the question of insurability presented by the application for reinstatement, defendant ''was limited to only those considerations contained within the four corners of the policy in suit.'' Plaintiff's policy did not contain a provision which required, as a matter of contract, that he should always remain in good health;

but no one would argue that the absence of such a clause would preclude defendant, in passing on an application for reinstatement, from considering the then state of plaintiff's health. There is no clause in the policy which, as a matter of contract, prohibited plaintiff from indulging in such eating habits as might lead to a bad state of health, or a deterioration of his physical condition; but after the policy lapsed, the company, in passing on an application for reinstatement, would have a right to reject the application on the ground (if the facts warranted) that the subject was then in a bad state of health. Thus, the absence of a clause in the policy would not control the decision, because the question was and is one of insurability of the applicant at the time of and within the meaning of that word as used in the reinstatement clause. After the lapse such clause became and was the only part of the contract then subsisting between the parties. Health is a question of physical hazard. Other factors, including over-insurance, are questions of so-called "moral hazards" involved in the risk. In the insurance business all are insurance hazards, differing between themselves only in their nature. All are hazards contemplated by the word "insurability." When plaintiff permitted his policy to lapse, he must have envisaged that the reinstatement clause would then become operative. The amount of disability insurance carried was and is just as much a matter within his control as bad physical habits, bad moral habits, or any other form of risk deterioration. We agree with defendant that plaintiff had no more right to demand that it, under the reinstatement clause, restore him to its records despite over-insurance than he would have to demand that the company restore him to its records despite facts which might have shown him to be either a poor physical risk or a poor moral risk.

Plaintiff argues that the mere exercise of the right of reinstatement cancels the lapse, leaving the original policy in force, and that the defendant arbitrarily tried to modify its policy. We agree with defendant that it is not the mere exercise of the right of reinstatement that cancels the lapse. If that were true, merely mailing in the application would be sufficient. It is the furnishing of evidence of insurability which ought to have satisfied the company that cancels the lapse. It is only when such proper evidence has been furnished that reinstatement becomes effective. We also agree with defendant that it did not seek to modify or write new terms into the policy. Plaintiff could have had the full benefit of the lapsed policy had he cared to make the appropriate revision of his disability limits in the other policies.

Plaintiff argues that defendant improperly considered all disability benefits when determining insurability. Since, if reinstated, defendant's policy would have furnished indemnity from either accident or sickness and thus the same hazards as the disability benefit of the other policies, it was and is proper to consider all other disability indemnities from similar hazards. This was consistent with a similar inquiry made in 1923. It is interesting to note Paragraphs (3), (A) 3, (B) 3 and (C) 3 of sec. 357 of the Insurance Code (par. 969, ch. 73, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 66.1032, subpars. (3), (A) 3, (B) 3, (C) 3]) relating to standard provisions in policies of insurance against loss or damage from the sickness or from the bodily injury or the death of the insured by accident. Every such policy issued or delivered to any person in this State is required, among other things, to contain a provision relative to reinstatement after lapse. Clause A, to be used in policies which insure only against loss from accident, must contain a statement that after lapse the subsequent acceptance

of a premium by the insurer or a duly authorized agent, shall reinstate the policy, but only to cover loss resulting from accidental injury thereafter sustained. Clause B, to be used in policies which insure only against loss from sickness, provides that the acceptance of the premium shall reinstate the policy, but only to cover such sickness as may begin more than 10 days after the date of such acceptance. Clause C, to be used in policies which insure against loss from both accident and sickness, provides that the subsequent acceptance of a premium shall reinstate the policy, but only to cover accidental injury thereafter sustained and such sickness as may begin more than 10 days after the date of such acceptance. Standard provision No. 3 in Clause 22 of the policy in suit provides that after default the subsequent acceptance of a premium by the company or by any of its duly authorized agents, shall reinstate the policy, but only to cover accidental injury thereafter sustained and such sickness as may begin more than 10 days after the date of such acceptance.

Plaintiff asserts that after he filed his application for reinstatement and because of the demand of defendant, he could have cancelled his $250 disability benefit payments under his Metropolitan Life Insurance policies, and could have cancelled his Fidelity & Casualty of New York disability benefits of $233.33; that then defendant would have been bound to reinstate his original policy without any changes; that although plaintiff would not have been able, thereafter, to have reacquired the irreplaceable insurance provided for in his Metropolitan policy, he could have purchased analogous adequate protection from any number of health and accident insurance companies selling modified forms of noncancellable life and accident insurance; that he could also have acquired other accident insurance to replace the Fidelity policy that would have been cancelled; that under these circum-

stances defendant would have been powerless to prevent plaintiff, after the policy in suit had been reinstated, to acquire the substituted policies; that this conclusion follows from the fact that the policy in suit, when reinstated, does not contain any pro rata clause or any clause restraining plaintiff from acquiring other similar insurance; that accordingly the demand of defendant that plaintiff cancel these other policies which he had, was not only unreasonable, but useless; and that the decisive element in the controversy is that the defendant had no right to consider the element of so-called ''over-insurance'' in the reinstatement of the policy in suit, when the policy itself expressly permitted such so-called ''over-insurance.'' Defendant concedes that if plaintiff had seen fit to readjust the amount of benefits provided in all the policies in force at the time of his application to revive defendant's policy, defendant would have been bound to accept his application for reinstatement, and states that it must not be lost sight of that if plaintiff had cared to make such a readjustment he could have had the full benefits of defendant's policy, thus demonstrating that defendant was not then unreasonable or capricious. Defendant discusses plaintiff's argument that having thus readjusted the amount of his disability benefits and having thus procured the reinstatement of defendant's policy, he could have gone out and either purchased further new insurance or acquired his old policies, apparently without limit and with reference to over-insurance. We agree with defendant that in his argument plaintiff ignores the uncontradicted evidence that in the case of noncancellable health and accident insurance policies, responsible underwriters did not write insurance in excess of approximately 50–60 per cent of the applicant's earned income, and did not write in excess of 75–80 per cent of the applicant's earned income in the case of the familiar cancellable health and accident policies; that as the spectre of

over-insurance made its appearance when plaintiff tendered his application to reinstate, in like manner would it make its appearance again, when having reinstated, he then tried to over-insure with other companies; and that plaintiff completely overlooks the uncontradicted evidence that responsible insurance companies do not write accident or health insurance in excess of the limits stated. Having procured a reinstatement, plaintiff could try to over-insure his earning capacity with other companies; but his application to such companies showing the amount of his insurance then outstanding would show that he was over-insured and these companies would reject his application. Plaintiff suggests that it is common knowledge that insurance companies frequently waive usual standards and requirements in issuing insurance policies of all kinds. It is obvious that a company having the right to waive, has the right to require. Under special circumstances a company might waive its usual requirements, but that is by the grace of the company and not something that the applicant would have the right to insist upon. Plaintiff urges that if the policy had not lapsed, defendant would have been bound to make good all of the terms of the policy even though, according to defendant's contention, plaintiff would have been "over-insured." Defendant concedes this argument, but points out that plaintiff did not pay his premiums, that the policy lapsed, that the rights of the parties were then altered, that the policy was no longer in effect, and that the only rights left to plaintiff were the rights afforded to him under the reinstatement clause. We agree with defendant's position.

We agree with plaintiff that Clause 24 places a $400 a month ceiling on the total disability indemnity payable under the policy, or a monthly ceiling of a lesser sum if plaintiff's earnings would be less than this sum, and that this ceiling would be effective with-

out regard to any other insurance plaintiff carried. We also agree that assuming that while the policy was in force, plaintiff became totally disabled from sickness and his past income on any basis or average would have been $600 monthly, defendant, under Clause 24, would have been obligated to pay him $400 a month for the period of his disability even if plaintiff. had carried other similar health insurance that provided additional monthly disability payments. If the average monthly earnings of plaintiff for the period of time that he had been actually employed during the two years immediately preceding the commencement of his hypothetical disability were only $200, he could only collect from the defendant company that amount of disability and there would be an appropriate readjustment of the premiums on account of the over-insurance. While the policy does not contain an apportionment clause, Clause 24 was notice to plaintiff that over-insurance was not permissible even as to the policy in suit.

Plaintiff, calling attention to defendant's letter of June 21, 1941, wherein defendant's agent stated that if plaintiff would complete the reinstatement blank and send it to him, he would see that plaintiff was given preferred and prompt attention, states that there was nothing ''preferred'' about the action of defendant in insisting that he cancel some of his irreplaceable life insurance disability provisions as a condition to the reinstatement of the policy, and that there was nothing ''preferred'' about defendant's action when it ''arbitrarily used plaintiff's earned income for the calendar year 1940, which just happened to be a year of low earnings for the plaintiff.'' Defendant replies that the word ''preferred'' was used in the sense of careful or serious. We agree that defendant did not accord plaintiff preferred treatment. There was no obligation on defendant to give plaintiff preferred treatment. Certainly there was no consideration for

the statement in the letter that he would be given preferred treatment. Plaintiff, in his petition for rehearing, suggests that following the rules of a court of conscience we should (if we believe a reversal is required) instruct the chancellor to enter a decree reinstating the policy under its original terms upon condition that plaintiff cancel the Fidelity accident policy. The cancellation of the Fidelity policy would reduce but would not eliminate the over-insurance applied for. We agree with defendant that to follow plaintiff's suggestion would be in effect to decide that the litigation was due to the fault of plaintiff and then, *non constat,* to order the defendant to reinstate the policy. Plaintiff consciously elected to stand or fall upon his own judgment and we do not feel that we would be justified in adopting his suggestion.

For the reasons stated the decree of the superior court of Cook county is reversed and the cause remanded with directions to enter a decree dismissing the complaint for want of equity.

*Decree reversed and cause remanded with directions.*

KILEY and LUPE, JJ., concur.